**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Michael Iheme,

Plaintiff,

v.

Speedway SuperAmerica, being sued as Speedway SuperAmerica, LLC,

Defendant.

Civil No. 01-491 (DWF/SRN)

**MEMORANDUM OPINION AND ORDER**

---

Clayton Dean Halunen, Esq., Halunen & Ness, 701 Fourth Avenue South, Suite 500, Minneapolis, MN 55415, counsel for Plaintiff.

John William Polley, Esq., and Holly M. Robbins, Esq., Fagre & Benson, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, counsel for Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on May 17, 2002, pursuant to Defendant's Motion for Summary Judgment. In the Complaint, Plaintiff alleges race discrimination, racial harassment, and retaliation in violation of the Minnesota Human Rights Act ("MHRA") and Title VII; negligent supervision, retention and investigation; and defamation. For the reasons set forth below, Defendant's motion is granted.

## Background

Defendant Speedway SuperAmerica ("SSA") hired Plaintiff Michael Iheme ("Iheme") as a district manager trainee ("DMT") in late 1999. DMTs undergo training with the goal of placing them as district managers, responsible for several SSA convenience stores and fuel stations. Iheme began the DMT program on January 27, 2000.

FILED MAY 22 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 22 2002
DEPUTY CLERK

SSA originally placed Iheme at SSA store #4311 in Coon Rapids, Minnesota. Store #4311 was managed by Bob Breitbach and was located in a region managed by William Bahl. Iheme remained at Store # 4311 until February 18, 2000. During his tenure there, Iheme asserts that Breitbach failed to teach him anything and often assigned him to menial tasks, such as cleaning bathrooms and removing garbage.[1] However, Iheme first complained about his treatment at Store #4311 in a letter dated March 17, 2000. In that letter, and another undated letter,[2] Iheme indicates that he receives disrespect from the clerks and store managers, though he does not indicate that that disrespect is motivated by racial animus. He also indicates that Breitbach was "very prejudice[d]," but the next sentence references Breitbach's disapproval of SSA's policy of hiring DMTs externally. As a result, it is not clear from the letter that Iheme means that Breitbach is racially prejudiced or prejudiced against outside hires. In either event, the letter was written long after Iheme left Store #4311.

SSA moved Iheme from Store #4311 to Store #4264 on February 21, 2000. Ostensibly the move was made because Breitbach was scheduled for surgery and could no longer manage training Iheme. A letter from Breitbach in Iheme's file, however, suggests that Breitbach did not wish to continue training Iheme because Iheme was not learning the material, was contemptuous of the cashiers and other employees, and was particularly disrespectful to female employees.

---

[1] SSA asserts that, because all DMTs must spend several months managing individual stores, all DMTs must be familiar with all aspects of running a store, including cleaning bathrooms and removing trash.

[2] Although the second letter is undated, it references events on March 24, 2000, as having occurred in the past; thus it is safe to assume that it was written on or after March 24, 2000.

Store #4264 was managed by Mark Hammack and was also in Bahl's district. Iheme worked at Store #4264 from February 21 to April 7. During Iheme's tenure at Store #4264, he wrote two letters to Patti Martin, his training coordinator in Ohio, complaining about the quality of training he was receiving. He expressed dismay over the menial tasks he was being assigned, concern that he was not learning the necessary skills to be a manager, and frustration over his problems with Breitbach–who, again, was no longer Iheme's trainer. After receiving Iheme's letters, SSA sent Pam Graupensperger, from Human Resources, to speak with Iheme. Graupensperger arranged to extend the DMT program for Iheme so that he would have an opportunity to learn what he needed to know and to make up time lost by Breitbach's alleged failure to train Iheme.

On April 10, 2000, SSA again moved Iheme to a store just north of Minneapolis, Store #4602, which was managed by James Larson. Iheme was stationed at Store #4602 from April 10 to April 26. During that time, Iheme sent two communications to Patty Martin, both of them praising Larson as a good teacher and indicating Iheme's own belief that he was ready to manage his own store. Iheme now claims, however, that the environment at Store #4602 was racially hostile.[3] Specifically, Larson and an older female cashier allegedly identified a number of African American customers as potential shoplifters and referred to them as "these black people." Iheme did not report any concerns about this behavior to SSA.

---

[3] Ironically, it appears that neither Iheme nor Larson were entirely candid about Iheme's training. Larson indicated to Iheme that he was performing well and would soon be ready to handle his own store; indeed, on April 26, Larson signed off on Iheme's weekly activity report–written by Iheme–which indicated that Iheme was progressing well and would be "100%" ready for his own store in a week. Yet just two days before, on April 24, Larson sent a note to human resources indicating that Iheme had a terrible attitude, did not take direction, treated other employees (especially women) quite poorly, refused to do many tasks because he was college educated, and violated numerous company policies.

Despite Iheme's belief that he was ready to manage his own store, Larson complained to Bahl, the district manager, that Iheme did not have the appropriate skills to run his own store. Bahl and Graupensperger informed Iheme that he was being demoted to a store manager trainee; the demotion involved a cut in pay. Furthermore, Iheme was moved to Store #4052 in Crystal, Minnesota; Store #4052 was managed by Clint Egwim and was in a district managed by Douglas Boes.

Iheme's first stint at Store #4052 lasted only until May 5, 2000, when Boes moved Iheme to Store #4375 in New Hope, Minnesota. Valerie Hahn had recently taken over management of the troubled New Hope store. Iheme believed that he was being brought in to manage certain aspects of Store #4375's operation in Hahn's stead. During Iheme's time at Store #4375, Iheme wrote two letters, one to Boes and one to Graupensperger, complaining that Hahn was not cooperating, not following Iheme's instructions. The letter to Boes does not reference race at all. In the letter to Graupensperger, Iheme suggests that the reason SSA has failed to respond to his complaints about the lack of respect he receives from cashiers is that he is African American. Iheme does not allege, however, that the cashiers show him disrespect because he is African American.

While Iheme was at Store #4375, SSA received a complaint from a customer indicating that Iheme had verbally abused a cashier over a name tag and that the incident was frightening to the customer. The cashier involved, however, indicated that Iheme was not abusive and that Iheme's response to the cashier's conduct was entirely appropriate.

On May 9, 2000, Iheme answered the phone at Store #4375. The woman on the phone identified herself as "Brenda" and asked to speak to Boes, who was at the store on that day. Iheme believed, correctly, that "Brenda" was Brenda Campbell, a manager of another SSA store

and a friend of Hahn. Iheme believed that Campbell and Hahn had been discussing Iheme, so he speculated that Campbell's call to Boes was about Iheme. He decided to listen to the phone conversation. Iheme contends that Campbell told Boes that he should not allow "that nigger" to give direction to Hahn and should not allow Iheme to run Store #4375.[4] Boes responded that Campbell should stay out of the matter, that it was Boes's issue and he would deal with it.

On May 19, 2000, Graupensperger and Bahl met with Iheme to discuss his ongoing problems. Iheme indicated that he felt his problems at SSA were because he was black. Graupensperger and Bahl told Iheme that Iheme's style, not his race, was causing his problems.

In early June, Boes returned Iheme to Store #4052 because he was afraid that Hahn would quit if she had to continue working with Iheme.

On July 12, 2000, Iheme was in an altercation with a cashier named Kovatec McPipe. Iheme demanded that McPipe show Iheme a receipt for a beverage McPipe was drinking, and McPipe refused. McPipe then attempted to enter the office, and Iheme told him not to. When McPipe persisted in trying to gain entry to the office, Iheme blocked the door and, at one point, physically touched McPipe and may have grabbed McPipe's arm. Iheme ultimately called the police to have McPipe removed from the store. SSA conducted an investigation, which included viewing the surveillance camera footage of the altercation. SSA concluded that McPipe had been insubordinate and fired him. SSA further concluded that Iheme had gone too far by grabbing McPipe and had violated company policy against physical contact with other employees and customers. SSA suspended Iheme for three days.

---

[4] Both Boes and Campbell vigorously deny that Campbell used any sort of racial epithet during the conversation.

On July 27, 2000, SSA received a complaint from a customer about Iheme. The customer alleged that she bought gas from the SSA and paid with a credit card. She then drove to the parking lot of a neighboring Burger King. The customer asserted that Iheme followed her to the parking lot and demanded that she come back to pay for the gas. When the customer asserted that she had already paid for the gas, Iheme insisted that she had not. The customer produced a receipt. According to the customer, Iheme walked away without apology. Iheme contends that he followed the woman, politely suggested that she might have forgotten to pay for the gas, and apologized profusely when she produced a receipt. Regardless of which characterization of the scenario is accurate, Iheme's conduct clearly violated SSA's policy that an SSA employee is not supposed to chase a customer suspected of a drive-off. Iheme asserts that he was unaware of any such policy.

Following the July 27, 2000, incident, SSA terminated Iheme. SSA informed Iheme that he was being terminated "because of the incident at Burger King."

Iheme asserts that SSA's purported reason for terminating him was pretextual and therefore defamatory in that Iheme has been compelled to publish the purported reason to other potential employers.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Hostile Work Environment**

To succeed on his hostile work environment claim, Iheme must make a *prima facie* showing that: (1) he is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) there is a causal nexus between the harassment and his status as a member of a protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) SSA knew or should have known of the harassment and failed to take prompt and remedial action. *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1128 (8th Cir. 2000).

Iheme is a member of a protected group, both by virtue of his race and by virtue of his national origin.[5] Iheme contends that he was subjected to unwelcome harassment when cashiers

---

[5] Iheme was born in Nigeria.

failed to pay him sufficient respect, he was required to clean bathrooms and remove garbage,[6] he heard Campbell use the word "nigger," and Larson and another cashier talked repeatedly about black shoplifters.[7] With respect to the first two issues, there is no evidence these conditions were racially motivated, that there was a causal nexus between Iheme's race and this "harassing" behavior. Similarly, with respect to Campbell's alleged use of the word "nigger," that statement was made in the course of a private phone conversation on which Iheme was eavesdropping; Iheme cannot assert that he was subjected to this harassment when he was only privy to it because he was secretly listening to what was meant to be a private conversation. At best, Iheme has offered evidence that he was subjected to discriminatory racial harassment when Larson and a cashier made repeated references to black shoplifters in Iheme's presence.

Having established that Iheme was subjected to discriminatory racial harassment, Iheme must further show that the workplace was permeated with "'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of the . . . employment and create[d] an abusive working environment.'" *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993)).

---

[6] Iheme did inform SSA, in a roundabout way, that Breitbach treated him unfavorably because of his race. However, Iheme offers no evidence that Breitbach was motivated by race other than his own bald assertion. Simply alleging racism is not sufficient to raise a question of fact on the issue of racial motivation. Moreover, Iheme did not inform SSA of the alleged racial element of Breitbach's conduct until after Iheme had been moved to a different store. While SSA perhaps had some moral obligation to follow up on Iheme's complaints and SSA's failure to do so might impact their liability in future cases, SSA's failure to confront Breitbach did not affect Iheme because Iheme had already been moved to another store.

[7] Iheme also seems to suggest that he took offense at being referred to as a "guinea pig." Iheme offers no contextual evidence to suggest that he was considered a guinea pig because SSA was "experimenting" with hiring black DMTs, and the term "guinea pig," standing alone, has no racial significance.

In order to alter a term or condition of Iheme's employment, the offensive environment must satisfy both a subjective and objective test; it must be hostile and abusive to the reasonable person, and Iheme had to perceive it as such. *Carter v. Chrysler Corp.*, 173 F.3d 693, 701-02 (8th Cir. 1999). Factors to consider when determining whether discriminatory activity "is sufficiently severe or pervasive include: [(1)] 'the frequency of the discriminatory conduct; [(2)] its severity; [(3)] whether it is physically threatening or humiliating, or a mere offensive utterance; and [(4)] whether it unreasonably interferes with an employee's work performance.'" *Bradley*, 232 F.3d at 631. The comments complained of, while offensive and inappropriate, were not threatening or humiliating to Iheme, did not unreasonably interfere with his work performance, and were neither severe nor pervasive enough to constitute actionable harassment.

Moreover, even if the Court were to conclude that such conduct was severe and pervasive enough to constitute actionable harassment, Iheme has offered no evidence that SSA knew or should have known about the behavior. Iheme was only present at Larson's store for a little over two weeks, certainly not long enough for SSA to have learned about the incidents through "the grapevine." Iheme never told SSA about the incidents, even after he left Larson's store. Indeed, Iheme's only report to SSA about his time with Larson indicated that Larson was an excellent teacher and that things were going well at that store. No reasonable fact finder could conclude that SSA knew or should have known of the discriminatory behavior of which Iheme now complains.

Iheme has failed to offer evidence of any objectionable behavior which could reasonably be inferred to be racially related, which actually affected a term or condition of his employment and of which SSA knew or should have known. Each incident of which Iheme complains may

meet one or even two of these criteria, but none of them meets all three. In the absence of any such conduct, Iheme's claim of racial harassment fails as a matter of law.

**3. Discrimination and Retaliation**

Iheme's claim for discrimination fails because there is no evidence that his race was a factor in any of SSA's decisions regarding his employment. At best, Iheme has offered evidence that Breitbach, Larson, Campbell, and one unidentified cashier at Store #4602 were bigoted–although the evidence of that is far from compelling–but he has not offered any evidence of discriminatory animus on the part of anyone at SSA who made decisions about Iheme's employment. Moreover, Iheme has not identified any similarly situated white person who was treated differently than he was. In short, Iheme has failed to make a *prima facie* case of discrimination because he has failed to adduce any evidence of a causal nexus between his race and any adverse employment action taken by SSA.[8]

Similarly, Iheme has not offered any evidence of a causal nexus between his complaints to SSA management and the adverse employment actions he endured. Several of the "adverse employment actions" of which Iheme complains, specifically the disrespect of the cashiers and the failure to train, took place before Iheme raised the issue of race. With respect to the

---

[8] At this point it is perhaps important to note the difference between animus in general and racial animus. Iheme has offered the affidavit of Justin Schwartzbauer in which Schwartzbauer states that he asked Boes why Boes was treating Iheme the way that he was and Boes responded "I just don't like him." Nothing in Title VII or the MHRA dictates that an employer must like all of his employees or that he must treat them all fairly. Title VII and the MHRA simply mandate that you cannot treat your employees unfairly *because of their race.* Boes may not have liked Iheme, and he may have treated him with gross unfairness. But there is absolutely nothing in the record to suggest that Boes disliked Iheme because he was black other than the simple fact that Boes was white and Iheme was black. As a matter of law, that is not enough.

remaining adverse employment actions, under the facts and circumstances of this case, mere temporal proximity is insufficient to support the inference of retaliatory motive.

Even if the Court were to find that Iheme has produced enough circumstantial evidence from which a reasonable fact-finder could conclude a causal nexus exists between the adverse employment actions and either Iheme's race or his complaints of ill-treatment, Iheme has offered no evidence that SSA's articulated non-discriminatory reasons for the adverse employment actions were pretextual. Iheme may dispute the veracity of the complaints which led to his termination and the thoroughness of SSA's investigation into the veracity of those complaints, but Iheme has offered no evidence that SSA's beliefs about Iheme's conduct were unreasonable or that they were insufficient to justify his termination.

**4. Common Law Negligence Claims**

SSA asserts that Iheme's claims of negligent supervision, negligent retention, and negligent investigation[9] are preempted by the exclusivity provision of the MHRA. Iheme claims that there is no preemption.

This Court acknowledges the nebulous state of the case law surrounding this issue, but it agrees "that the MHRA preempts a common law cause of action if: (1) the factual basis and injuries supporting the common law claim also would establish a violation of the MHRA; and (2) the obligations the defendant owes to the plaintiff, as a practical matter, are the same under both the common law and MHRA." *Pierce v. Rainbow Foods Group, Inc.*, 158 F. Supp. 2d 969, 975-76 (D. Minn. 2001). Iheme relies upon the same incidents of alleged racial harassment and

---

[9] The Court is unaware of any Minnesota tort of "negligent investigation." The Court will consider this claim, then, to simply be one of general negligence. The label attached to the tort has no effect on the preemption analysis.

discrimination for his common law claims as for his MHRA claims. Accordingly, Iheme's common law claims, as pleaded, are preempted by their corresponding statutory claims.

**5. Defamation**

It is virtually axiomatic that truth is an absolute defense to a claim of defamation. Iheme contends that SSA defamed him by giving him a false reason for his discharge that he has been forced to self-publish to other potential employers. Iheme contends that Bahl told him that his employment was being terminated "because of the incident at Burger King." Iheme has testified that he has been "forced" to tell potential employers that he was terminated for "confronting a customer" and for accusing a customer of doing something she did not do. Iheme has offered no evidence that these statements are untrue. Iheme *did* confront a customer and accuse her of doing something she did not do; Iheme admits to this. The only way in which the allegedly defamatory statements could be untrue is if SSA terminated Iheme for some other reason. As discussed above, Iheme has offered no evidence from which a fact-finder could conclude that SSA's articulated reason for terminating his employment was pretextual. In other words, Iheme has offered no evidence from which a jury could conclude that the allegedly defamatory statements are false. Accordingly, Iheme's claim for defamation fails as a matter of law.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 10) is **GRANTED**.

2. The **COMPLAINT** is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 22, 2002

DONOVAN W. FRANK
Judge of United States District Court

MAY 2 2 2002

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.